produces the apparatus which reads and writes the disks and they sell that component to other manufacturers who in turn sell it to consumers, right? Yes, Your Honor. And in that context, who is Quanta Storage reducing to the French? The manufacturers or the ultimate consumers? Both, Your Honor. What's the evidence that they're inducing infringement by the ultimate consumers? The evidence that they're inducing infringement by the ultimate consumers is that they have designed and programmed the drive so that the drive, when used as intended, automatically and predictably results in infringement of the manufacturers. But in order to have an inducement to that, you have to have some sort of communication to the consumers that producing the product is not enough. Respectfully, Your Honor, I believe in this circumstance producing the product and distributing it is enough. In the Supreme Court, in its Grokster case at footnote 13, I believe specifically said that with appropriate evidence of intent, which of course we have by the communications with the OEM manufacturers, that the distribution of a product designed to specifically infringe can, in fact, be sufficient for inducement. I think that this... But not if it has other functions. If one function is infringing the other function, what kind of inducement do you have in place? Well, I think it is clear under the circumstances that the drives are set up and marketed in a way that users are encouraged to use the recording functions of the drive because if users were interested in only carrying out the reading functions, which is to say the non-infringing functions of the drive, they could buy a quanta drive that has only the non-infringing reading functions. But even the writing functions don't necessarily infringe. For example, the buffer underrun would only infringe if there was a circumstance that presented a buffer underrun. Well, that's correct, Your Honor, although I think buffer underrun is actually a circumstance where the evidence is strong is that there routinely and almost always is infringement. In fact, the district court, in its opinion, recognized expressly that buffer underrun events, and this is in page 19 of the joint appendix, page 19 of the court's opinion, buffer underrun events are ordinary and expected occurrence in an optical disk drive, particularly when a drive is attached to a host computer on which multiple applications are running simultaneously. But it doesn't necessarily. There could be circumstances in which it doesn't happen, but it is ordinary and expected that it should happen, and certainly a jury could conclude that it does happen routinely. And also some of the patents only relate to activities for recording and rewritable media. That's correct. Two of the patents apply both to recordable and rewritable media, and two of the patents, which is to say in the background… …are for rewritable disks only. So for those consumers that ultimately use only recordable media, then that doesn't apply. That method would not be performed. It would be true that if there were users who chose to use only recordable media and not rewritable media, they would not have occasion to use those two patents, but there's no evidence that there are such… How do we know on this record that that wasn't the case? In most situations, some situations, we're left to speculate as to whether that actually is accomplished or not. Well, I don't believe that one's left to speculate. I think that the evidence in the record is the best evidence attainable of how the drives function and how they're expected to function. I don't think, for example, if one contrasts this with the recent ACCO decision from this court in which the court said, well, you should have gone out and taken surveys or gotten better direct evidence of infringement, the court stressed that it would have been relatively easy to find out whether there was infringement there. I think that the court also emphasized that in that case, unlike here, there was no evidence of intent to cause infringement. All of the circumstantial evidence was pointed against infringement, and under those circumstances, the court felt that it would be too speculative to suppose that someone out there somewhere might be infringing. Here, we have a situation where there is evidence of intent to cause infringement. They know about the features, advertise them as better than others. They design the driver. That is the problem. They didn't advertise them to the ultimate consumers, right? Right, but that really doesn't matter. Well, it does, I think. If you look at footnote 13, as you referred to in Brock's book, it talks about encouraging, encouraging. There's no – I'm not sure that there's any authority. The mere sale of a product is inducing without some – inducing to infringe a process without some separate encouraging to the purchaser to use that product to infringe. Contributory infringement is a different question. We'll get to that. We're talking about inducement here. Right, but in the context of inducement, what the Supreme Court said in Grobster is that there has to be evidence of intent to cause infringement. And here we certainly have evidence of intent to cause infringement because it drives – right. Encouraging. No, but it says – it also says that – the Supreme Court also said that it doesn't matter whether the encouragement was received because the point of the encouragement is to show the state of mind of the encourager. Let's suppose we say that encouragement is necessary. There has to be some encouragement. If you find inducement of infringement by the ultimate consumers, there has to be some encouragement. There's no evidence in this record of encouragement. Well, there is evidence of encouragement in two senses – for end users now. Obviously, I think that the evidence is remarkably strong with regard to the original equipment manufacturer customers, and that alone is reason that it was error to grant summary judgment. With regard to the end user infringers, the encouragement comes in the form of a more limited promotion in that the drives are advertised to be, for example, 24X drives or 48X speed drives. And those features, the 24X speed, can only be achieved by using, for example, the zone CLD. But not advertised by Qantas Storage, the ultimate consumers. Sure, Your Honor. Now, on the Qantas Storage website, and we have copies of the pages in the Joint Appendix, it says this is a drive that's 24X drive or 48X drive. I only know that's directed to the ultimate consumers. Well, it's telling the whole world of people who would be buying drives. Do you think there's evidence that consumers read the website? Well, there's evidence that when consumers can't get the drives to write as advertised, they e-mail to Qantas Storage and say, my drive isn't working. But there's no evidence that they read the website and understood that they would be encouraged to use it for infringing, well, whatever the fact is, infringing use, right? Your Honor, I think that people, what the record shows is that people who buy the drives are trying to buy drives that write at particular speeds. And the evidence is that they can't write at particular speeds without using the infringing features. And the evidence is also that when they are unable to write at the speeds that they desire, they complain about it. Well, I want to ask another question about the use and delay to the sales by Qantas Storage to the manufacturers. My understanding is that the manufacturers are alleged to infringe because they test the product to see if it's Qantas Storage, correct? Yes, Your Honor. Okay. What evidence is there that Qantas Storage knew that the testing that would be infringing is going on? Qantas Storage helps them to carry out the tests, Your Honor. They have a dedicated sales force for each of the major computer manufacturers whose job it is to ensure that the tests are carried out in such a way to show that the drives perform as the specifications demand. And so they have full-time people for Hewlett-Packard, for Dell, for Gateway, whose job it is to be sure that the drives would be qualified for use in those computer companies' devices. So they knew about it. They helped develop the test protocols. There's no doubt about the fact that they know what's going on there. And the question is, why is Dell, why are Dell and Gateway doing these tests? It's not because Dell has an awful lot of DVDs that it would like to record that the tests are being carried out. Rather, the tests are being carried out to ensure that when end users turn on the computers and record disks using the drive, which is what the purpose of the drive is, that they will do so in the fast, reliable, convenient way that's made possible by the patented methods here. Okay. So let's turn to the contributor. Yes, Your Honor. Do you agree that this is a question, a personal question here, as to whether the inclusion of this write feature in here can be considered separately from the device as a whole? I don't believe that this Court has further developed that question. That's why I'm asking. And your view is that because there is a portion of the hardware here that is used for write only, that there's not a substantial non-intrinsic use for that portion of the device? That's correct. And what does the evidence show that there is a separate portion of the hardware devoted to write only? Well, the evidence shows that you can buy a read-only drive. So you can have all of the hardware for reading, which is sold separately by Quantum. And for more money, you can pay to get the drive that reads and writes. And those writing the software modules and the associated circuitry for which you pay extra... Did anybody describe the circuitry and the hardware that's necessary for the write function? It's undisputed, Your Honor, that there are software modules in the drive that are designed for writing that have no other non-intrinsic use. Hardware? I think the reports talk about software modules and associated circuitry. I do not recall the level of detail at which the hardware is analyzed. But certainly the software modules are distinct and have no separate use. But the methods that are recited in the claims of these patents are performed by the use not only of the software modules and whatever associated hardware there might be, but by things like the motors and the lasers and things that are shared with the read functionality of the optical drive. In other words, the optical drive that we're talking about that performs both the read capability and the write capability may have separate functionality and may have separate components, but there are also a lot of shared components. And it's not easily separated. This is not a question of having in one shell a separate read unit and a separate write unit. Well, I think the way to approach that issue, Your Honor, is by reference to the text of the statute, which says that liability for contributory infringement attaches whenever a person sells a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or adapted for use in infringement of such a patent, and not a staple article of Congress suitable for substantial non-infringing use. When one looks at that and says, well, what is it that has to be especially made or especially adapted for use in infringement? It is a material or apparatus that constitutes a material part of the invention. I don't think there's any doubt that the software modules that are issued here constitute a material part of the invention and are therefore, because we know that they can be separated, are suitable for analysis under the statute. Now, it may also be the case that you have a product where there are, suppose one sold subassemblies. It might be that you would sell the right chip with other associated hardware that would be put into the product. That might also be a contributory infringement. I don't think the analysis has to happen at just one level of the machine. Well, what's your theory? What's your theory that any inclusion of any feature in a device, which can only be used to perform the patent method, makes the device infringable? I think that by its terms, if you have a separable, separately identifiable component, which is not always the case in some cases. For example, Sony was one where there was no real way of separating functions. If you have a separable component that constitutes a material part of the invention and has no substantial amount of infringing use, I think 271C applies. Yes, Your Honor. But you're not selling just the component. You're selling the whole product. Well, I think it's well established that if one sells a car with an infringing carburetor, one is selling the carburetor even if the contract for sale talks about the car. Certainly in this court, in the ITC context, the court is constantly faced with circumstances in which a computer chip, for example, will be accused of infringing a patent, and there will be exclusion orders that apply to cell phones or computers or cable set-top boxes or any number of things of which the accused component is a part. So I think it's pretty clear that one can sell or import a component of the device when one imports the device. Is there any evidence in the record establishing direct infringement? Well, there is evidence in the record establishing direct infringement by the end user, excuse me, by the original equipment manufacturer, computer makers, and by defendant new, and some of the tests showing that all of the features were used are summarized in, for example, footnote four of our reply brief, which has a number of reconsultations. With respect to the direct infringement, the final consumer was not established to be directly infringing. But, Your Honor, and this comes back to the point I was beginning to make in response to Judge Lynn's question earlier, there is no good way to establish direct infringement here, and that is a key point of distinction between this case and, for example, ACCA. And that's for two reasons. Number one, even if you could find the end users who have the quantum drives, they would not be able to tell you whether they're doing the infringing methods because the methods are invisible for the most part to all except the most technically sophisticated users. Second of all, you can't even find the end users that have these particular drives. What was established is that the, first of all, the drives are branded products. So if you go to your notebook computer, rip the drive out, and look at it, it will not say quantum, it will say Philips or Sony or Optiar, and it will probably have the name of the computer maker on it too. And so even by looking, even if you ask people, do you have a quantum drive, they wouldn't be able to tell. So the only place to go to find out how many of these drives there are and where they ended up is with the original equipment manufacturer, people who we spoke to, and even they don't know which drives went into which computers because Do you need to establish direct infringement? Do you need to establish indirect infringement? Your Honor, I believe that we can. We have the best evidence that's available to establish direct infringement because of the way that the drives operate by default. And I think, I realize that in ACCO and in Dynacore, the court stated a principle which, although appropriate in those cases, is not a binding rule decision for all inducement cases. And if applied too broadly, would run afoul of prosperity and would also lead to illogical results. I think the key features about Dynacore and about ACCO were that you had a situation where there was no evidence that anyone could actually directly infringe the patent. There was no evidence of inducement or intent to cause infringement. In fact, just the opposite. All of the instructions in those cases were to use a non-infringing method. And finally, all of the circumstantial evidence pointed against there being any direct infringement. And in those circumstances, the court was forced to say, Look, if you want to avoid summary judgment, you've either got to show us that somebody really did this or else you've got to show us that there's no way to avoid doing it. But without anything there to go on, we're stuck. We have to grant summary judgment against you. Here, by contrast, we don't have a good way of getting evidence of direct infringement, unlike in ACCO. And it would be unreasonable to require direct proof that can't be gotten. Second of all, there's strong circumstantial evidence of direct infringement, not only by the people testing, there's direct evidence of that, but by the end users because of the way the drive is designed to operate automatically. And finally, there's evidence of encouragement. You keep referring to the way the drive is designed to operate automatically, but as we've discussed with respect to several of the patents and several of the features, there are also ways in which the optical drive can operate without infringement. So it's not automatic. Well, but the question, Your Honor, is why would it? I mean, in principle, one could disable the features of the drive. One could. A technically sophisticated user could. For example, using them on not rewritable media, but reportable media only. Well, but even in those circumstances, you would have infringement of two of the patents. Well, that's true. But two of the patents you would not. And then you've got situations where there may not be the buffer on the drive. And you may not have other situations. So it's not automatic. Well, if automatic means that it – excuse me – I think it would be an odd rule if it were necessary to show, in order to survive a liability question on summary judgment. I mean, maybe there could be arguments made. It's an interesting question whether arguments could be made about the extent of damages as a result of there possibly being some circumstances in which this was not infringed. But in order to avoid summary judgment of liability, given the high likelihood that this happens and the evidence that people complain when it doesn't happen, given the direct infringement – Why didn't you – you know, you had discovery, right? In this case, in order to avoid summary judgment of liability, right? There was discovery, of course. So you had the ability to survey consumers. Are you going to subpoena consumers? Well, but I think the point – How come that you didn't get any evidence of – direct evidence of direct infringement? Are you in a position of having to rely on these inferences? Well, that was the point that I was trying to make in response to Glyn's question earlier, is that there is no reliable way to identify who has these drives. And even if you could find them, they couldn't tell by looking at the drives that they had a quanta drive. And even if they could tell that they had a quanta drive, they wouldn't know, except in the rarest of circumstances, whether the drive was carrying out an infringement. Just because it's difficult doesn't mean that you're excused from proof. Well, Your Honor, again, I think in circumstances where there is – where there is strong circumstantial evidence that it happens, where there is evidence that it was intended to happen, and that the drive was designed specifically to facilitate this behavior, it seems odd to require that if anything less than a 100 percent infringement results from the use of the product, that there can't be liability for inducement. I think in Grobster, again, you know, it was assumed that there was some non-copyrighted works that were being copied, and yet the Supreme Court was willing to say that there was enough evidence there, there was enough substantial evidence to get this liability. Well, we have extensive evidence here of direct infringement in the form of people complaining when they couldn't write in the way that was promised. But your infringement case is not limited to only those people, only those tests that were – your allegation is with respect to direct infringement across the board based on all sales of the non-copyright drives, correct? Yes, but even Quanta's own damages expert, Dr. Reed, did his calculation based on all of the infringement sales. He quibbled about how many drives actually made it to the United States, but he didn't try to reduce the amount of damages based on the thought that some people might not be carrying out the infringing methods. So I think the assumption in Quanta's own case is that the drives were used in an infringing manner. I'd like to rephrase the question. We still have three minutes. I appreciate it. Good morning. May it please the Court. There is no dispute here that if a drive is reading, it's not infringing. And under the contributory infringement statute, if a device, an apparatus, has a substantial non-infringing use, there's no contributory infringement. The statute focuses on the thing that was sold, having a- Why is that true? In the hypothetical, we're dealing with a method. Let's make it simple so I can understand. We're dealing with a method of removing a nail from a board, and there's a hammer that has a specially adapted claw, which can only perform the patented method of removing a nail. But it also has a head for pounding nails into the board. Are you saying that the sale of that hammer, which has a head which can be used in a non-infringing way, and a claw that can't be, is not covered? I would say, Your Honor, in that case, you look at whether the allegedly infringing use is a substantial non-infringing use. And I think here there's no dispute that reading is a substantial non-infringing use. Assuming my hypothetical that half the time the hammer is used to pound the nails into the board, and the other half the time it's used to extract, and you're saying that because somebody could use it to pound nails into the board, means that it's not contributory infringement? I'm saying that you look at the substantiality of the non-infringing use, and I'm suggesting that pounding the nail into the board is not a substantial non-infringing use of that hammer in that situation. I think, well, under your hypothetical, if the patent is directed to removing nails, then I don't think that pounding a nail into the board would be a substantial non-infringing use. Here, the thing that was, I just don't, I think that it's a non-substantial use of that hammer in that instance, Your Honor. I'm not, I'm suggesting here that. You've got a problem here, I think, because in that hypothetical, I would say, I think that most people would say that the sale of that hammer is a contributory infringement of the method for removing nails. But I'm trying to distinguish between that and this situation and other situations. I would say a very difficult and important problem. I'm asking, where would you draw the line? Well, Your Honor, if you look at the Hodash case, which was not cited in the briefs, it's at 833-F2-1575. I'm not sure that it was dealing with D rather than C. I'm not sure exactly what that case means. Well, let's draw the line in this case. I don't think that this drive is as easily divisible as the plaintiff is suggesting. Even the recosome expert, Dr. Schlesinger, stated that each drive has a single laser used for both reading and writing. That's at A-2072. It's clear that each disc has one pickup head, one motor to spin the disc. That motor, that pickup head, is used for both reading and writing. Does a dual function then take you out of the contributory infringement? Or is it because you can use it both ways and you're not quite sure which way to use it? Well, I think it shows, Your Honor, that there is a substantial non-infringing use of the drive and that you can't divide reading from writing as the plaintiff is suggesting. If I use it 50% of the time to read, 50% of the time to write, which would be substantial? Well, Your Honor, there's no evidence of end users and how often or how frequently they use the drive. Well, I use it 50% of the time to read. Well, I would think that there would be 100% of the time a substantial non-infringing use because in this case, you can't divide reading from writing. So there is a substantial non-infringing use for the thing sold. And the statute focuses on the thing being sold, not a subcomponent of what's being sold, but actually what was sold. You look at what was sold. Is there a substantial non-infringing use for the thing being sold? Yeah, but the statute used the word component. A component of an apparatus, but the component is the thing being sold. Here, the drive itself is the component, the thing being sold. I mean, this is very troubling because you're saying any time, no matter how elaborate the device is in being designed to perform the infringing method, that as long as it has some other use, even though that use doesn't require all the features of the device, that it becomes non-infringing. I'm not saying in every instance. I'm saying you look at where's the line. That's the problem. Where's the line? How do we draw the line? Well, I can draw the line in this case. And I think maybe you take that up on a case-by-case basis. In this case, there is clearly a substantial non-infringing use for the thing sold. And you cannot divide the reading from the writing function. But it's not true. I thought that there was software modules and perhaps hardware also, which was only to be used for the writing function. That software may be used only for the writing function, but that is only one of the steps of the claim. There are other steps of the claim for which you have to spin the disk. There are other steps to do it. But isn't that a component that meets the terms of the statute? But we're not selling that component. We're selling an apparatus. Of which that is a part. It is a part of the apparatus. Yes. You're selling a component, albeit with other things. And that component, which provides the right capability, that component has no substantial non-infringing use, does it? I would say that there is software that may be used to do some of the four features that make up the patents. But it's not clear that those four features are actually infringing when used. There are lots of ways to record and therefore use some of that code that wouldn't be infringing. You could use the driver at low speed. You wouldn't use zone CLV. You could record without interrupting, without doing other things. You wouldn't use buffer underrun. So there are lots of things you can do with that code that would be non-infringing. So no, I don't think by just selling that code, you are selling something that does not have a substantial non-infringing use. You're saying the software modules that are in the devices that you're selling are not specially adapted to perform the combination of the functions that work in these claims and these patents? That's correct. As the court noted, not all recording, they're designed to record. That module, that software module is designed to record. It's not necessarily designed to record using those particular functions. I don't think you can divide the software module. In your drive that provides that capability, you do sell drives that provide the capability that are set forth in these claims, do you not? I would quibble with that saying no, we don't, because we have a non-infringement position. But we do provide drives that perform the four features that RICO alleges claim infringement patents. And what is it that gives you the capability to perform those functions? It's the software module. Well, it's the entire apparatus that we sell. It's the pickup head, it's the motor, it is some software. It's a number of different components of the entire apparatus. So there are software modules and some associated hardware that are part of it? Yes, but that software module that is a part of it, some of it may deal with recording, but not all recording is an infringement. You can record even at high speeds for some of the drives and not implicate the ZCLV mode which RICO alleges infringement. So you're saying even the software modules, the components that provide the capability have additional functionality that you would argue is a substantial amount of infringing functionality? Certainly the entire software component has other functionality. That's right. Where do you draw the line about dividing? Do we have to go through lines? That's what I'm trying to suggest is that you should look at the thing being sold and does it have a substantial amount of infringing use? The idea here is not to rewrite the law of contributory infringement. You still don't answer the question of inducement. If the product has a substantial amount of infringement use, those are separate issues. But they're related. They both relate to indirect infringement. The statute is written. Do you have the data that's by experts telling us what portions of the hardware and software are related to the right one? Are we going to have that? No, not do you have it in that. Is it part of the summary judgment record? There is some testimony in the record about what part of some piece of software is dedicated to a certain function, yes. But if you look at the entirety of the software, there's no dispute that that software is used for both reading and writing. And that's why I'm suggesting the answer to this question is not to rewrite the law of contributory infringement where you focus on the thing being sold. And under the statute, if the thing being sold has a substantial amount of infringement use, there's no contributory infringement. That doesn't answer it. No matter how many features it has, no matter how much hardware it has, no matter how much software it has, which can only be used to infringe. I'm not saying that. Perhaps. I would have to look at each item being sold on a case-by-case basis to determine whether it would be possible in some circumstances to divide it up. What I'm saying here, at least here, if we look at the product being sold, it's not easily divisible. Their own expert has said that. Their own expert says that there are pieces of this apparatus being sold that are used for both reading and writing. What is the organizational impact on the original question? Would it be 50%? Would it be 25% substantial? Could it be less than 25%? How would you determine that? I suppose it would depend on the particular case before you and whether you thought that that was a trivial use or non-substantial use. What I'm suggesting here is reading is clearly a substantial non-infringing use. A disc is useless if you can't read with it. That's not a question presented to you here in this case. Reading is clearly a substantial non-infringing use. If you cannot read with that drive, it's useless. You don't want a drive that you can just record with. You need a drive that you can read with. Here, substantiality is not a question. Let's look at the facts of this case. Substantiality is clearly not a question. You can't divide the product as they suggest. Their own experts suggest you can't divide the product. Substantiality is a question. Of course it's a question. The question is, is it a substantial non-infringing use if one part of the device can perform non-infringing functions where the only use of another part of the device is to infringe? I don't think they've established that there's just software that by itself will infringe. That's not the limitations of the claim. The limitations of the claim require that you use a laser, and the laser is used for both reading and writing. So let's look at the entirety of what is being claimed here and determine whether that has a substantial non-infringing use. The entirety of what is being claimed here is also, you need the laser in order to perform some of the steps of the method. You need to spin the disk in order to perform some of the steps of the method. And so if you look at the thing being sold, you can't divide it along the lines they're suggesting. It's not as easy as your hammer argument, Your Honor. It's not as divisible. The thing that was sold in this case was a dual deck unit. One deck reads and one deck writes, and they are completely separate and separately electrically connected, but they're in the same housing, and that's what's being sold. Is that a contributory infringement? I would like to know more facts, but I think you're getting perhaps closer to a situation where perhaps someone just tacked on a drive that could read to a box that was primarily designed to record. In that case, if that were the facts presented, then in that situation perhaps. So it's not a question of just looking at the device that's sold, because it's not hypothetical. The device that's sold is a dual deck unit. But at least for this case, I would like to focus on the device being sold and the patent claims. And what is it they're claiming? They're claiming methods. For those methods, you need a laser. For those methods, you need to spin that disk. That motor that spins that disk, that laser is used for both reading and writing. So if you look at the thing being sold and the thing being claimed, there is a substantial amount of infringing use here, and that's reading. And it's not as easily divisible as they suggest. Their own expert has said that. If it's fact dependent on this case, then maybe we have to have a trial to determine whether the case falls on one side or the other side of the line, because apparently there's not very clear evidence right now as to what aspects of the hardware or software are devoted only to infringing uses. Well, I think it is undisputed, Your Honor. I mean, if you look at Rico's own expert, he stated that each drive has a single laser used for both reading and writing. That's at A2072. It is quite clear that you cannot divide that laser between a reading and writing function. That's only one feature. What about the other features? Well, I think that should be enough. I mean, you're looking at the thing being sold. My suggestion is not to rewrite... You're bringing back again to saying that the fact that some aspect of the invention can be used in a non-infringing manner is sufficient to make the whole thing non-infringing. That seems to be an extreme position. And you keep having difficulty telling us where to draw the line. I think you draw the line by looking at what's being sold and what is being claimed. And if what is being claimed and what is being sold here has a substantial non-infringing use, as in this case on the undisputed facts, there is a substantial non-infringing use. I think the statute itself focuses on the component being sold, the thing being sold. I don't think the answer is to rewrite the statute. I think that would be the wrong way to approach the problem. If you're bothered by your hammer hypothetical, the thing to do is to look at inducement and whether there has been an inducement and other indirect liability theories of infringement. It's not to rewrite the statute. I think the statute is quite clear that if the apparatus, the thing, the component being sold, has a substantial non-infringing use and there's no dispute that reading is a substantial non-infringing use, there is no liability for contributory infringement. That does not answer the question on inducement. I think that's the right way to look at this. I don't think it's possible to draw the line as you're suggesting. And in any event, in this case, it's clear that you cannot divide that apparatus as the plaintiff would suggest. Even their own expert disagrees with that. But isn't there a guilty question in fact that has to be determined on the issue of inducement? Well, I think the court was correct. Was there ever some judgment basis on the issue of inducement? I think the court was correct in noting that the only evidence relevant to the inducement question was all directed to the branded computer companies. Qantas Storage manufactures the drives for licensed, well, not always licensed, but for optical disk drive manufacturers such as Philips and Sony. Philips and Sony then sell those optical disk drives to branded computer companies. The branded computer companies then put them in computers and sell them to end-users. There's no evidence of any communication between Qantas Storage and end-users. So any evidence at all of inducement would be directed to the branded computer companies. And those branded computer companies test a few sample drives every year. So I think it's important to point that out. Now, on the inducement question, they point to technical specifications. Well, first of all, they point to a technical presentation made jointly by Qantas Storage and Philips Adele. In the first instance, I don't think that's relevant evidence because Philips, there's no dispute, its drives are licensed. And the witness, Mr. Chen, testified that you need to look at, on a case-by-case basis, to determine what was in each presentation to each branded computer company. So I don't think you can extrapolate from that one presentation and say they're all the same as the plaintiff is trying to do here. Does Qantas also sell any products that include these drives? Qantas Computer sells computers to branded computer companies, but Qantas Storage does not. Qantas Storage sells some drives to new ones. Qantas Computer sells the entire computer to the branded company. And with respect to those items, is there any communication between Qantas and the ultimate consumer of the product? There's no evidence of any communication between Qantas Computer and the ultimate consumer of the product. In fact, the only communications that we have here are emails, and I think plaintiff's counsel misspoke. Those emails are not directed to Qantas Storage. They're directed to Hewlett Packard, who then passes them to Qantas Storage, and Qantas Storage simply replaces the drive. And it would have been possible to do marketing studies to find out how many users recorded and did other things while they were recording, which might have given rise to a buffer underrun, or recorded using what media at what speeds. All of those things could have been done, but were not done. And you could just pull Dell's customers in general and get that information, even if you didn't know that a particular computer had what particular drive in it. At least you would have an idea how end users use these drives. And in fact, if you used the sales data that was produced by Dell, you could have figured out what computers were sold with what particular drive and done that kind of study. That wasn't done here. Would Dell be a contributory infringer if it sold a computer that had a disk drive that only performed the right capabilities that we're discussing here? Because arguably the computer has a substantial non-infringing use for other purposes. Would Dell not a contributory infringer because after all, the computer can do a host of other things totally unrelated to the... I think that comes back to the same question we were debating before on contributory infringement. Is what Dell's selling, does it have a substantial non-infringing use? And if so... My hypothetical is that the right drive that is connected only performs the functions set forth in the method prints. So there's no non-infringing... The question about is it a read or write, it's only a write capable drive that performs the specific functions set forth in these method prints. If it's only capable of performing the specific functions set forth in the method prints, I think it could be a contributory infringer. But yet they're selling the product that they're selling is a computer with the write drive as its own. The computer has a substantial non-infringing use. You can use it for a host of things having nothing to do with the drive. And that's true. It's a drive to hook for a contributory infringer. I understood you to suggest that they were selling only a drive. No, a computer with the drive that only performs the write capability specified in these method prints. Are they off the hook? They're not a contributory infringer. I think under the statute, you would look at what was being sold. And if it has a substantial non-infringing use, then they wouldn't be a contributory infringer, but they certainly may be guilty of inducement. I think that's the proper analysis. But you would still be required to show some communication to the direct infringer, right? Yes, there would have to be some communication with the direct infringer. There would have to be some encouragement of those end users to record with the drive. So that's all you would need in Judge Lin's hypothetical because the recording automatically performed those features. But of course, that's not our case. Can you say they're not necessarily off the hook? They may be subject to an inducement claim. That's correct. They still may be subject to an inducement claim. There are apparatus claims in these patents as well. And they could have sued on those apparatus claims. And Dell could be, in your hypothetical, could be sued on the apparatus claims. And then you don't need to look at this issue. They chose not to sue on the apparatus claims. They could have done that. That's another way to look at the particular issue. That's a choice they made. But the statute is clear. If the thing being sold has a substantial non-infringing use, you're not liable for contributory infringement. Although, admittedly, that does not answer the inducement question. That is a separate issue that we should take up. Quickly, the website. Four seconds. Four seconds. I think I'll concede my four seconds. Thank you, Your Honor. Thank you. I'll try to cover just a couple of points briefly in response. On the inducement issue, there is, in addition to the advertising that we spoke of earlier, there is also evidence of repair, service, and replacement of the drives for end users carried out by Quanta, including software updates specifically for, for example, the right strategy, which are directed to the infringing features of the drives. And that does indicate an intent on the part of Quanta to perpetuate the infringing use on the part of end users. On the question of whether design can suffice to show inducement where there is evidence of intent to cause infringement, I would direct the Court's attention to page 22 of our brief. The water technologies case, the crystal semiconductor case, and the other cases cited there, I think strongly stand for the proposition that design can give rise to an infringement, an inducement liability. And finally, the additional piece of inducement evidence is, again, when the drives don't perform as promised and the end users complain about it, that is evidence that the drives are being used in the intended fashion. With regard to contributory infringement, respectfully, I think Mr. Garnett was taking the question by saying, well, you look at the thing sold, you look at the thing sold. The question that the Court kept asking was, where do you draw the line? How do you decide what to look at? And we would answer that by saying that one looks to the specific language of the statute. At any time one sells a separable component constituting a material part of the invention, one has crossed into 271C liability. And that may happen. I think a material part of the invention in this context would mean something that is used to meet at least one claim limitation. I think that would be a sensible starting point for that. And here we do have software that's used to meet a number of claim limitations in terms of the way it controls the drives. And ultimately, to the extent that one were to accept Mr. Garnett's invitation to decide all of this on a case-by-case basis, then this would surely be a case that would need to be sent back for a jury to decide whether there were substantial non-infringing uses of the various components at issue. Thank you.